Good afternoon. We're here for argument in Desert Outdoor Advertising v. City of Oakland. Judge Fletcher and I welcome Judge Schaback amongst us, if only in electronic form today. Good to be with you. Thank you. Counsel, you may proceed. May it please the Court. My name is Alan Hurston. I represent Desert Outdoor Advertising. This is a facial and as applied challenge to Oakland's regulation of freeway signs. Section 1501 of Oakland Sign Code is the main basis of regulation of freeway signs. And it is not the traditional on-site, off-site regulation, because some on-site speech is permissible and some on-site speech is not permissible. As I put down in my brief, at a Burger King, it can name the product it sells, Whoppers. It cannot say, sign the initiative petition here. Therefore, commercial speech is favored over noncommercial speech, and that violates the First Amendment. Well, would the City agree that noncommercial speech – and I think there's a factual question at the outset, it's just what the statute means, and I understand the City's position to be somewhat different, not with regard to whether what you just asserted is legal, but whether regard what you asserted is, in fact, what the statute says. Correct. The district court, though, did find, as I recall, that that was correct, that – well, at least with the time and temperature provision, that's in the – that also violates the First Amendment, because that's clearly a disallowance of an on-site, a noncommercial speech. But he severed that. He severed that, and, of course, the issue is whether or not an exception that allows speech can be severed. And I put down in my brief, I argued that that was a case of first impression for this Court. However, this Court did, in the Fallon v. City of Redmond, stated that an exception that allows speech cannot be severed, and I think that this Court is bound by that, if there can't be any severance of the time and temperature regulation. Now, he also held that that provision, the management code, related only to advertising and it did not relate to noncommercial speech. And once he'd severed that part, that would seem to be the case. Well, that was his opinion, yes. I disagree with that. I think the code is very clear that this allows some noncommercial speech. Clearly, a church is limited to the name of the church under Section 1501. It cannot say, pray here on Sundays. It can say its name, but not pray here on Sundays. Why not? Why can't it say, pray here on Sundays? Because under the code, it's limited to five, I believe, five stated things, what it can say on a freeway sign. It can say the name of the church, it can say four other things, and also time and temperature, if it wants, but it cannot say, pray here on Sundays. And that, again, is noncommercial speech being disallowed based upon content. There's also the planning code, and the city makes a big statement about the planning code, which does disallow future advertising signs. However, the planning code has its own definition of advertising signs, and one of the things that's disallowed is a sign that draws attention to a business or service on the same lot, but there's not a major function of that on that lot. So a major function is not defined, but presumably then Burger King can still advertise Whoppers, but cannot say, sign the initiative petition here, because that would not be a major function. And therefore, we have the same problem. We have commercial speech favored over noncommercial speech in violation of the First Amendment. Also, that Burger King cannot say, pray at First Baptist Church three miles down the road, because that's not on the lot, and therefore, we contend that it favors noncommercial speech over noncommercial speech. Now, another problem that we had is that Oakland has various unfettered discretion as to who can put up signs. The district court found that its conditional use permit and design review standards were unconstitutional, but failed to give a remedy. My feeling is, at the very least, this Court should provide a remedy or set this case back to the district court for trial to see what the remedy should be, because, again, being found unconstitutional with no remedy is quite an odd occurrence. As to the variance, the standards were held by the district court to be unconstitutional. They were not, you know, practical hardship, detrimental to public welfare. But yet the Court said because it claims they weren't actually applied to desert outdoor, that somehow that corrected the constitutional defect. Do we know exactly what the variance code reads now? No. Well, it reads there are two different standards, both of which are unconstitutional. And so the question is, does the district court have the ability to apply to the   versus the city of Oakland versus the city of Oakland? Because that would only apply to the facial attack. As the applied attack, that would be under the code as it existed when the applications for the signs were made or when the sign was built under this Court's opinion, Valley Outdoor versus City of Riverside. Well, I guess my view would be if it's been substantially changed since the case was before the Court, that maybe that part of the case is moot and we just ought to send it back. Well, then we have the problem, as far as the facial attack only could be considered, not the as-applied attack. But the facial attack, it's not moot because the city can very well change its ordinance and go back to the way it used to be. And indeed, in 90 days after this Court gives its opinion, it will change its code. And our view is that the new ordinance is just a sham, that it's only put there for the purpose of this case. And it even states that. What is the – what are the provisions were actually before the Court? Was this emergency variance code modification, was that before the Court? Well, the one that's in our excerpt of record. Yes. After the motions for sobering judgment were filed, the city changed its ordinance. And then the Court then looked at the new ordinance, as it should for a facial attack but not the as-applied attack. But just sticking to exactly what was before the Court, so it considered it, and then has there been any subsequent change? Right. There was a second – what happened is I put down in my brief that the new – the first new ordinance expired, and apparently the city forgot about it or something and let it expire. So then they have another one, after I wrote my brief, another one, ordinance which they say will expire in 90 days after this Court gives its opinion. So what we're getting is just a –  I think they're substantially the same, and basically they have – they're still unconstitutional, I think, because they still – Well, that's – I'm just trying to make sure that we understand the record. Right. You can get to your argument in a minute. Okay. But you say they're almost the same. Is there any substantial difference at all? Well, I didn't see it. Maybe I overlooked something. I apologize if I did. They said in the new one that any time a conditional use permit is needed, now we would have a variance, something like that. I couldn't understand it, frankly, and I didn't give it much credence because I don't think it's important, the new one. Its standards are just as unconstitutional, practical difficulty or unnecessary hardship. Very – very inexact statement allowing complete discretion on the part of the city. Strict compliance would deprive privileges enjoyed by others against not defined and whether or not the – there's an inconsistency with the purposes of the zoning regulations so that relief should be allowed. Again, those are all unconstitutional. I don't think it's very important. What the city did, I think it's unconstitutional. It has no effect on the as-applied challenge, and it's going to be changed anyway 90 days after this Court gives its opinion. I'm sure they're planning to go back to the original standard. Also, in the new ordinance, it never says that the old planning code standards are not in use. It just says these can be used. So really, either one can be used. It's either the old unconstitutional planning code standards or the new unconstitutional standards. So I think that the – Do you have any evidence of the old standards being applied currently? Well, it's not before the Court. To the extent that you're seeking injunctive relief, we have to be aware of the passage of time and change in circumstances. And so you're making pretty serious charges that they can use whatever they want. Do you have anything to back up those charges? Well, I'm looking at the code. The code – the new ordinance doesn't say that the old ordinance is not to be used. That's what I'm getting at. I have some personal knowledge, but again, that's not in evidence before the Court. And it would be unfair to bring it up to the Court now. I mean, I look at the ordinance and it talks about the planning code is hereby amended to add, delete, or modify sections as set forth. That doesn't suggest that the old ordinance remains in effect unaffected. Well, it adds, modifies, but doesn't say it's no longer in effect. It doesn't say that those old standards are no longer in effect. It says these are standards also. But again, I don't see it makes a whole lot of difference because the new standards are just as unconstitutional as the old, first of all. And as to the as-applied challenge, that was considered when the applications were made. And in the as-applied challenge, the planning code, in effect, when the applications were made, it considered it as what governs. For the other challenge – Well, let me ask you a final – what are you – what are you terming an as-applied challenge? I mean, that's really a theoretical challenge as well. You're not singling out – you're not saying the city singled out your client. Oh, yes. The three signs. There were three applications. Three parcels were involved. And the three applications were made for variances. On one of them, they went through the variance process and they applied the unconstitutional standards to disallow the sign. So it was clearly an as-applied violation. And what was the basis for the disallowal? They used the unconstitutional standards. Well, they used the standard, but what was the basis for the disallowal? I mean, did they specify anything more specific? Yes. I believe the city – Did they specify one of the provisions that was subsequently taken out or potentially revised in the emergency ordinance? I don't have that right now. If the Court wants me to brief you on it, I'm certainly willing to do that. I could – I could – Well, let's take just parcel one. As I understand it, they put up a large sign visible from the freeway, which was an advertisement. That's correct. So they were told to take that down. It didn't have anything to do with variance. But they did apply for variance. As a matter of fact, Mr. Patton wrote a letter saying to my client, Desert Outdoor, go ahead and apply for a variance. So they did. Desert Outdoor applied for the variance on that side, and then the city said, well, we can't give you a variance. They didn't put it through the variance process. Well, the variance wouldn't really apply in that situation if it's flat out a violation of the management code. Isn't that right? No. The variance is designed to relieve the hardships of the sign code. That's the whole purpose of the variance. Well, it might be for signs that were not part of the management code. No, it would be for any sign. Indeed, the city said, wrote a letter saying you can get a variance for this. Go ahead and apply for it. But I'm getting off into theory here. You're not arguing that the city, and I don't understand your argument to say that the city had excessive discretion and improperly exercised that discretion or failed to exercise that discretion. The advertising sign was pretty much what the ordinance was aimed at. This isn't the exceptional case where we want to make an exception because this really doesn't fit the pattern. I mean, is there anything about your client's sign that would seem to qualify for a variance or would logically call for a variance? Well, yes, because the hardship imposed by the code. The hardship means that it's simply the fact that they don't permit advertising signs anymore. Right. That's something uniquely applied to that parcel or to your client. Well, but the standard is so unconstitutional that a planning commission could say that, a city could say that. Indeed, that was the case of Desert Outdoor v. City of Moreno Valley, where the mere fact that there were unconstitutional standards made the permit requirement void, according to this Court. And the same rule should apply to the City of Oakland. Does the Court have any further questions? Do you want to reserve your time for rebuttal? Yes, I'd like to reserve my time. Okay. Thank you. Good afternoon, and may it please the Court. I'm Christopher Key. I'm here on behalf of the defendant, City of Oakland. I think it might be helpful to the Court if you started out with telling us exactly what ordinances are currently in effect and whether they were before the Court. Yes, Your Honor. The ordinance that is currently in effect is the ordinance that the district court considered, the amended ordinance that the district court considered in its opinion. That was ordinance number 12566. And that's the one that's in our excerpt of record? That's correct. It is at page 130 in your excerpt of record. The subsequent emergency ordinance, which was the subject of the Court's supplemental questions, carried forth the provision. All that did was to extend the time that the emergency ordinance was in effect until 90 days after this Court issues its opinion. The terms of ordinance 12566 are carried forth precisely as they were enacted initially. So the ordinance that is currently in effect is the same as the ordinance that was considered by the district court and found to be constitutional. If it's useful for the Court, the emergency procedures, I don't know if there's some confusion about that term. That's something of a term of art. The city council occasionally, well, city governments are constrained by certain notice requirements, and under the Oakland's charter, they are allowed to enact emergency ordinances that circumvent some of those notice requirements. It has the same force and effect as an ordinance that is adopted in the general course of the city's business, but they just refer to it as an emergency ordinance. And that is under section 213 to 216 in the Oakland City Charter. But it seems to be a procedure which doesn't have much stability to it. For example, 90 days after our opinion, it's going to expire. The purpose of that, and I realize this is not on the record and it is somewhat anecdotal, and there was not really much of an occasion to, an opportunity to develop a record on that. Rewriting an ordinance requires a considerable amount of staff time and would, and the theory was that rather than enacting an ordinance without the guidance of this Court, to finalize the ordinance, I should say, without the guidance of a decision from this Court, that it would be a better use of the city's resources to wait until the decision was made, and then once we have that in hand, we'll have hopefully some guidelines with which to enact further revisions of the ordinance if that's necessary. It's our view that the ordinance in its present state is constitutional. We've tried very hard to conform with the holdings of this Court and the Supreme Court in putting it together. Now, tell us exactly what the variances can be, what's provided. You mean what are the requirements are, what the criteria are? In order to get a variance, what are the criteria? The criteria are those that are set out in Ordinance 12-566, and it's at page 131 of your excerpts of record. It's section 3 of that ordinance. They are as follows. Would you like me to read them into the record, or? I would like you to at least summarize them so we know what they are. Okay. The first is that strict compliance with the regulation would result in practical difficulty or unnecessary hardship inconsistent with the purposes of the zoning regulations. The second is that the strict compliance with the regulations would deprive the applicant of privileges enjoyed by owners of similarly zoned property. And the third is that the variance would not constitute a grant of special privilege inconsistent with the zoning. So in essence, what it appears to require is that the applicant would have to show that they've somehow been singled out and subject to a burden that other citizens in Oakland are not burdened by. That number one, which talks about practical considerations, what are they talking about? That, Your Honor, we've discussed that at some length in our brief, and that subsection is we've – is – I'm looking for the exact citation in our brief. The language of that is the language that has been universally adopted for variances. That is the underlying justification, as it were, for variances as a general matter. And so the – by including it in our – in the revised ordinance, the intent of the city was to make sure that we're applying a standard that is one that's universally applied in variances – has been historically applied and is universally applied. And in these sorts of situations, it is – If I understand correctly, that was the language the district court said was not excessively subjective. Is that correct? That's correct. The provision that the court had some concern about was the one that referred to livability of the surrounding area. And again, just to make sure I've got the facts right, that was the piece that was referred to the district court in the revised ordinance. Is that correct? That's correct, Your Honor. And that was taken out at what point in the district court process? That was taken out the – it was presented to the court during the briefing schedule for the cross motions for summary judgment. So the court had that in front of it before it issued its order, well before it issued its order. But at the time the lawsuit was filed, the provision was still there. It was taken out during the pendency of the litigation. That's correct. And Mr. Herseth is correct that with respect to the – his as-applied challenge, I would – I take issue with him on one point. The only – the variance procedures were applied only with respect to parcel 2 of the three parcels that are the subject of this lawsuit. The district court found in a footnote that it discussed at some length that the variance procedures, even though they contained language that was perhaps – gave too much discretion to a city official as a general matter, in this specific instance, the city official was able to utilize those standards and apply them in an objective – in an objective matter. That puzzled me because what the district court said was that it was on page 21 of his opinion, said that as applied there wasn't any trouble, but that the variance procedure allows for unconstitutional discretion, which sounds like a facial challenge. Well, Your Honor, I think that the – well, there was a facial challenge to it. And I think that the difficulty is, is that an analogy might be the – under the – it's cited in our brief, the City of Los Angeles v. Heller case, which holds that even if a city has an unconstitutional policy, that unless that policy is applied to a plaintiff in an unconstitutional manner, there's been no violation of his or her civil rights. And so I think that it's an – it's an analogous situation in this case, where even though he found that the standards as a general matter gave undue discretion, this city official, Ms. McCollum, was able to apply them in a manner that was sufficiently objective. And her – the application appears in your excerpts of record – her application of those standards, the Parcel 2, appears in the record at 53 and 54. And it's the denial of – it is the denial of the application for Parcel 2. And in essence, what she did was say, your sign is too big for the surrounding area. The buildings around this particular – where the sign is going to be put up are two stories high. You're going to put up a five-story building that's incompatible with the purposes of the zoning. I mean, it's a very – a very kind of objective time, place and manner, if you will, analysis that she enters into. And the Court concluded that even though there was the possibility, because that's what a facial challenge is based on, the idea that there's a possibility that a public official could exercise unfettered discretion, that that possibility did not come about in this specific instance. And so as a result, he denied the as-applied challenge with respect to Parcel 2. So I think that that's the – that's how that – that is. Kennedy, to make sure we're on the same part of it, I understand – part of my confusion here is figuring out what's in effect when. And part of my confusion is the terminology of facial and as-applied, because – and this is really to appellant's counsel, too, to anticipate what's going to come back during rebuttal. The argument that says we look to the ordinance in effect at the time the complaint is filed, okay, I understand, right. As-applied challenge, you look to see what was applied. But the argument, I understand, it was rejected by the district court because he said, well, even if theoretically it was too broad, that is, it was potentially subject to a facial challenge, as applied here, there was not unfettered discretion. Is that your understanding of the district court's ruling? That's correct. Does the Court have any further questions about this aspect of it, the variance and the C.D.C.? Let me ask, in connection with the management code, if it's a flat prohibition, as it was in respect to Parcel I, could there be any opportunity to go for a variance? Not with respect to an advertising sign, a commercial sign that's primarily visible from the freeway, the sign that Section 1501, which is the sort of shorthand for the provision of municipal code, there is no variance that is allowed. So when the official or whoever said, well, why don't you go for a variance, he just shouldn't have said that, probably. Well, the difficulty was, Your Honor, that in the initial permit application, Desert Outdoor indicated that this sign was going to be an on-site sign that was not visible from the freeway. Neither of those representations were true. And I think that that may have been the case. I don't know, I shouldn't say because I don't know, but that would certainly provide a basis for the building officials to, because in that circumstance, because the sign was too big for an on-site sign, that they would require a variance. But once it became apparent there was a site inspection by Ms. McCollum, this is in the record, and she found that, in fact, that there was no business on the site, so therefore it was not an on-site sign, and it was, in fact, primarily visible from the freeway. And at that point, that's when the letters started issuing, saying, I'm sorry, this does not comply with Section 1501, therefore variances do not apply, and please take the sign down. And all that is laid out in Mr. Patton's declaration, which is in your excerpts of record, and Mr. Wong's declaration. Those are at 79 and 84, respectively, in your excerpts. So parcels 1 and 3, the city takes the position, weren't subject to unbridled discretion or excessive discretion because there was no discretion because the variance provision did not apply to them. That's correct. And the reason the variance provision applied to, and this may be a segue into the content-based aspect of the argument, the reason the variance provisions applied to parcel 2 was the representation was that it was going to contain non-commercial speech. And because it contained non-commercial speech, it was not subject to the absolute prohibition under Section 1501 because of the size and type of the sign, a variance would be required at that point. So that was the reason parcel 2 was subject to the variance provision. Now, as to parcel 3, did they put up an advertising sign? There seemed to be a little discrepancy there. To be honest, Your Honor, I'm not entirely certain of the how the events transpired from the record, and I think that the district court was also confused about that. And I was confused. Well, you're not alone. We're in good company. I believe that what happened was that once it became clear to Mr. Herson can certainly answer this more thoroughly than I, but my understanding is that once it was clear that there was an absolute prohibition on advertising signs, commercial signs visible from the freeway, that they determined there was no sense in applying for a sign permit or any sort of variance because they deemed that it would be futile because it would be denied at that point. I think that's the history of parcel 3. And I think that the record, maybe the complaint bears that out. But it was constructed and an advertising sign put on it? No. And one sign has actually been erected, and that's the one that's on parcel 1, which is there in all its glory to this day, right off of Interstate 880 in downtown Oakland. Are there further questions about this portion of it? No. I take it you're going to get to the content-based or the other? Yes, just briefly, because I don't have much time left. As Plaintiff's counsel pointed out, the challenge, the content-based and commercial versus noncommercial aspect of their case is based exclusively on Section 1501, which is solely a limitation on advertising signs visible from the freeway. These facts are undisputed. There are 1,400 existing billboards in the City of Oakland. All of those billboards may contain noncommercial messages. What are deemed special signs are also allowed nearly everywhere in the City of Oakland, and those can also contain noncommercial messages. Any so-called on-site sign can contain a noncommercial message, so long as it relates to an activity on the property. Off-site, noncommercial signs, as we were discussing with Parcel 2, are permissible with a variance. The City Council has also directed enforcement of the ordinance so that any limitations on types of signs that are allowed within the City are interpreted and enforced in favor of noncommercial speech. Given those facts, which are undisputed in this record, the City codes conform precisely with this Court's holdings in the City of Mesa and the Clear Channel cases. While the Code absolutely bans construction of new off-site commercial signs that are primarily visible from the freeway, it allows noncommercial speech on all other signs that are otherwise permissible in the City of Oakland. As such, this idea that it favors commercial signs over noncommercial signs just has no support whatsoever in the record. In fact, the record shows because there are certain types of signs where noncommercial speech is permitted and commercial speech is not, special signs, for instance, off-site noncommercial signs for which a variance is required, the City's codes favor noncommercial speech over commercial speech. The district court got that one entirely correct. With respect to the idea that the ordinances are content-based, which I don't know that counsel touched on this that much, the district court did find that Chapter 1501, as written, was content-based in that it contained a time and temperature exception to the ban on off-site advertising signs. The court applied the test for severance that was developed under California law, which is under this Court's precedence, the guidance for severance, and he concluded that the offending provision was severable and he preserved the remainder of Section 1501. That is an entirely correct application of severance law, and it preserves the constitutionality of the ordinance. If the 1501 applied only to advertising commercial speech, why was this time and temperature thing in there at all, because it appeared that that would be the only noncommercial thing that would be allowed, that's one way you could read it, isn't that right? That is correct, Your Honor. That the presence of the time and temperature sign was evidently a, and I'm grasping for the word, but it was a commercial or a noncommercial type speech that was within the ordinance. But the implication, then, is that the 1501 applied to both commercial and noncommercial. That is the implication, Your Honor, but on the record that was presented to the district court, which is undisputed at this point, the city provided declaration after declaration from the officials charged with enforcing the ordinance, which said advertising as set out on this. And I understand all that. I explain, as I don't, you don't have a reporter's transcript, but when this came up at the hearing, my understanding is, and this is based on conversations with the enforcement staff, that that was nothing more than an artifact of a much earlier time, and the ordinance had always been enforced as if the advertising referred to simply advertising, as that's commonly understood. And my time is about out. If the Court has any further questions, I'm going to go. Okay. Thank you very much. Thank you, Mr. Herson. Thank you. Returning to 1501, in fact, the record shows that an application was made to apply to be a big brother, for example, which is a noncommercial speech. And that was denied. So the statement that we allow all noncommercial speech on freeway signs is just not true. And I think we have to look at the actual facts as to what happened, not some self-serving declaration by Mr. Patton. It's what actually happens. And I think Desert Outdoor or the City of Orange, a case involving the City of Orange, went into that aspect also. Is the reference to the big brother sign application, is that part of the record? Yes, I believe that's possible, too. Well, let me ask this. Once you pass the hurdle, you aren't 1501 doesn't apply to you because it's noncommercial speech. And if we agree on that, then you have to go to the other code. And the question is, does it comply or do you need a variance? And they told you it's too darn big and it's too this and that. Right. And our position is that a variance could have a variance for those signs. One of the things that's interesting is the one particular standard that the district court found was unconstitutional but never applied, but by not applying it, there was a violation because they did not consider it in itself as a violation. Because maybe Desert Outdoor under that standard was allowed to have a freeway sign. So by not applying the unconstitutional portion, the Oakland was committed to an unconstitutional act. Getting back to the standards, now, in effect, practical difficulty or unnecessary hardship is a very subjective standard that no one can tell, no one knows if he's allowed a sign under those standards. And that is what is the constitutional defect under the current law. Well, how would you – I mean, the English language only has so many words to choose from. The provision in question makes specific reference to practical difficulty or unnecessary hardship inconsistent with the purpose of the zoning regulations due to unique physical or topographical circumstances or conditions of design. They're trying to say, you know, there's something special about that particular place that means we've got to add a fudge factor. How else would you express that notion but in words like that? Well, you can get a variance for size if it's specific. Let's say the variance can say if your lot is 1,500 square feet, you can get a variance for a certain size or something. Or if your lot is a certain height near the freeway, if it's a small below the freeway level, you can get a variance if you want to make your sign higher, something like that. These standards are very good for houses, let's say, for a planning commission, a standard for how many windows could be in a house, for instance. You may get a variance for that. But not the First Amendment. The Constitution doesn't care about how many windows may be on a house, but it does care about speech. When you talk about First Amendment variances for First Amendment activities, then you have to have a very special, very specific standards so that we don't have a sign czar sitting back and saying, okay, you can have a variance. I like you, but you I don't like, no variance for you. And that's the very danger of this. And that's why the First Amendment ---- Kennedy, I mean, unless you're saying that there is no verbiage in the language that works, so you can't have exceptions, or if you have any kind of exceptions, or room for wiggle room, you can't have that kind of ordinance, what language would you propose for what it is the city seems to be trying to accomplish with this provision? Has to be objective standards, as I said. If you're ---- Topographical circumstances, unique physical circumstances, isn't that objective enough? No. No one knows what that means. Who knows what practical difficulty means? Well, I think I know what it means is just because you want to have a sign doesn't mean you qualify. Well, unnecessary hardship. Maybe because we can't put a sign anywhere else. That's a hardship. This is the only place we have a lease for a sign. We want to put up a sign here. We have a hardship. We can't put up a sign anywhere else. That's a hardship. It's a subjective thing. It has to be objective standards to apply. Again, as to size, size of the lot, maybe the height of the lot compared to the freeway, those are the things. Does the Court have any other questions? Judge Shea? I take it we do not have any other questions. We thank you. We thank both counsel for the argument. The case just argued is submitted. And we are adjourned.
judges: B. Fletcher, Clifton, Shea